SETTLE et al. v. BALTIMORE & O. S. W. R. CO.

(Circuit Court of Appeals, Sixth Circuit. May 7, 1918.)

No. 3083.

1. COMMERCE ☜33—TRANSPORTATION—INTERSTATE OR INTRASTATE—"INTER-STATE COMMERCE."

Whether a given transportation is interstate or intrastate must be determined by the essential character of the commerce, and an interstate character cannot be evaded by the mere device of billing to an intermediate point and then rebilling from that point; but a new shipment by a consignee of an interstate shipment in the cars in which received .to other points of destination does not necessarily establish continuity of movement, nor prevent a reshipment to a point within the same state from having an independent and intrastate character.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Interstate Commerce.]

2. COMMERCE ☜33—TRANSPORTATION—INTERSTATE OR INTRASTATE—INTER-STATE COMMERCE.

Interstate shipments of lumber by carload were billed to a point where the cars were received by the consignee and the freight paid. The railroad company made a trackage charge for placing the cars on a house track, and from there they were rebilled to another point in the same state on a line of the same company, not having been unloaded. The company also charged demurrage if the cars were not reconsigned within the free time limit. *Held*, that the second shipment was a separate and intrastate shipment, governed by intrastate rates, although it was intended by the consignees when the original shipments were made.

In Error to the District Court of the United States for the Southern District of Ohio; Howard C. Hollister, Judge.

Action at law by the Baltimore & Ohio Southwestern Railroad Company against W. H. Settle and George W. Clephane, partners as W. H. Settle & Co. Judgment for plaintiff, and defendants bring error. Reversed.

Harry C. Barnes, of Cincinnati, Ohio, for plaintiffs in error.

Harmon, Colston, Goldsmith & Hoadley, of Cincinnati, Ohio (Geo. Hoadley, of Cincinnati, Ohio, of counsel), for defendant in error.

Before KNAPPEN and DENISON, Circuit Judges, and SATER, District Judge.

KNAPPEN, Circuit Judge. The defendant in error, as plaintiff below, sued plaintiffs in error for the difference between the freight charges actually paid and those which plaintiff claims should have been paid on certain shipments of lumber. The pertinent facts stated in the petition are these: Plaintiff is engaged in interstate commerce as a common carrier by railroad, owning and operating a line from Cincinnati, Ohio, to Louisville, Ky., and other points. The shipments in question all originated south of the Ohio river, and were of two classes: First, those originally consigned to the defendants and billed directly to Oakley, Ohio, which is within the switching district of Cincinnati; second, those originally consigned to others at Cincinnati, or elsewhere,

purchased by defendants while in transit, and upon arrival at Cincinnati switched to Oakley. It was defendant's intention from the time of the shipments or of their purchase, as the case may be, that they would be received by the defendants at Madisonville. There were in force lawful interstate rates from the points of origin of the several shipments to Cincinnati and Oakley (the rates to Oakley being the same as to Cincinnati), as well as to Madisonville. There was a lawful local or intrastate rate (published by state authority) from Oakley to Madisonville. Defendants paid, in each case, to the railways bringing the lumber to Cincinnati, the interstate rate to that place—applicable to Oakley. Each of the cars was ordered by defendants to be delivered to them at Oakley, and upon its arrival at that place was "received by the defendants, although the lumber was not removed from the cars"; plaintiff making a trackage charge for placing the car on the public team track. Each shipment was "by the direction of the defendants moved to Madisonville, Ohio, under a new bill of lading or contract of shipment" made by defendants, at the local or intrastate rate. On all the cars not so reconsigned within 24 hours (the free time allowed for reconsigning carload freight) plaintiff charged defendants demurrage or car service at the rate of $1 per day per car for the time of detention beyond the free time limit. It also charged demurrage on all the cars at Madisonville after the free time allowed for unloading, viz. 48 hours. The interstate rate from the point of origin to Madisonville in each case exceeded the sum of the interstate rate and the local rate from Oakley to Madisonville, and the defendants took the course they did for the purpose of getting the lower rates. This suit is for the excess. The District Judge overruled a demurrer to the petition, and, defendants declining to plead over, rendered judgment against them for the excess claimed. This writ is to review that judgment.

[1] The case turns upon the question whether the shipments from Oakley to Madisonville were purely local, or whether, on the other hand, they retained their original interstate character as being merely continuations of the initial interstate movements from the points of origin to Oakley—in other words, whether defendants' original and continuous intention to rebill and ship to Madisonville, after arrival at Oakley, made the continued carriage, although local in form, essentially interstate. In the latter case the transportation was within the exclusive jurisdiction of the Interstate Commerce Commission, the interstate rate controlled and the judgment below was right. It is well settled that whether a given transportation is interstate or intrastate must be determined by the essential character of the commerce, and that an interstate character cannot be evaded by the mere device of billing to an intermediate point and then rebilling from that point. So. Pacific Term. Co. v. Interstate Commerce Commission, 219 U. S. 498, 31 Sup. Ct. 279, 55 L. Ed. 310; Ohio R. R. Com. v. Worthington, 225 U. S. 101, 32 Sup. Ct. 653, 56 L. Ed. 1004; Texas & N. O. R. Co. v. Sabine Tram Co., 227 U. S. 111, 33 Sup. Ct. 229, 57 L. Ed. 442; Louisiana R. R. Com. v. Texas & Pac. R. Co., 229 U. S. 336, 33 Sup. Ct. 837, 57 L. Ed. 1215; A., T. & S. F. Ry. Co. v. Harold, 241 U. S. 371, 36 Sup. Ct. 665,

60 L. Ed. 1050; Kanotex Refining Co. v. A., T. & S. F. Ry. Co., 34 Interst. Com. Com'n. 271; McFadden v. Alabama Gt. Southern Ry. Co. (C. C. A. 3) 241 Fed. 562, 154 C. C. A. 338. On the other hand, if the shipments from Oakley to Madisonville were purely local in character the intrastate rates were properly paid, and the judgment below was wrong.

[2] Does the case fall within, or is it distinguishable from, the cases above cited? So. Pacific Term. Co. v. Interstate Commerce Commission, supra, is of immediate pertinency only as declaring the broad proposition that the Interstate Commerce Commission has jurisdiction to regulate charges of a terminal company which is a part of a railroad and steamship system and operates terminals such as those of the Southern Pacific at Galveston, Tex. Among the prominent considerations recognized in that case, as establishing the interstate character of the shipments there in question, were that the Terminal Company's piers were facilities of import and export traffic—a means of transition from land carriage to water carriage; that they were controlled by the Southern Pacific Company through stock ownership; that the goods in question were destined for export, and by their delivery to the railway must be considered as having been delivered for transportation to their foreign destination, the terminal company being part of the railway for that purpose.

In Ohio R. R. Com. v. Worthington, supra, it was held that a rate fixed by a state railroad commission on that part of interstate carriage which includes the actual placing of the shipments into vessels, ready to be carried beyond the state destination, is, as to merchandise intended for points beyond the state (in this case Ohio coal destined for upper lake ports), a burden on interstate commerce, and beyond the power of the state to impose, even if the merchandise is billed from a point within the state to the point where the vessel is—in that case from the Ohio mines to an Ohio port on Lake Erie. Stress was laid on the fact that the intrastate rate was intended to and did cover an integral part of the interstate movement—"the transportation from the mine to the Lake Erie port, the placing upon the vessel and the trimming or distributing in the hold, if required, so that the vessel may complete such interstate carriage." 225 U. S. 109, 32 Sup. Ct. 656 (56 L. Ed. 1004).

In Texas & N. O. R. R. v. Sabine Tram Co., supra, it was held that shipments of lumber on local bills of lading from one point in a state to another point in the same state, destined from the beginning for export, were, under the circumstances of that case, foreign and not intrastate commerce. Among the facts specially found in that case were that the lumber was ordered, manufactured and shipped for export; that the shipper regarded the shipments in question as export shipments, and "demanded, expected, and received the use of terminal facilities, additional free time, and other privileges accorded to shippers of export freight under export tariffs" (227 U. S. 116, 33 Sup. Ct. page 231 [57 L. Ed. 442]), and all the lumber was in fact unloaded by the shipper from the cars into the terminal company's slips or upon its docks in reach of the ship's tackle and loaded into ships previously

chartered for the purpose by the shippers, and which carried the same themselves direct to Europe.

In Louisiana R. R. Com. v. Texas & Pacific Ry. Co., supra, it was held that staves and logs intended by the shipper to be exported to foreign countries and shipped from points within the state to a seaport, also therein, from which they were to be exported, were in interstate and foreign commerce, notwithstanding they were shipped on local bills of lading for the initial journey, and so were subject to interstate and not intrastate charges, and within federal and not state jurisdiction. This case is in the same class with the Sabine Tram Company Case, supra. Among the considerations mentioned, as indicating a continuous carriage, was the fact that "no demurrage was tendered by the shipper or consignee or received by the carrier on account of delays in handling beyond the four days allowed by the rules." 229 U. S. 340, 33 Sup. Ct. page 839 (57 L. Ed. 1215).

In Atchison, T. & S. F. Ry. Co. v. Harold, supra, it was held that, although the original interstate bill of lading of a car shipment was surrendered for an intrastate bill while the car was still in transit, yet, if the car moved in continuous interstate commerce shipment from its departure to its destination, delivery at an intermediate point and substitution of an intrastate bill of lading is not such a new and distinct shipment as takes the car out of interstate commerce.

In Kanotex Refining Co. v. A., T. & S. F. Ry. Co., supra, the company's refinery was at Caney, Kan., from which it shipped oil to one of its distributing stations at Woodward, Okl. In order to get the benefit of lower freight rates, it billed its shipments to Kiowa (the point in Kansas nearest Woodward) consigned to an agent, whose sole function was to act as consignee and to rebill the interstate shipments to Woodward, he occasionally paying freight charges therefor. "As a matter of fact, the cars were sometimes actually handled from Caney through to Woodward in the same train." No actual possession was taken by the agent and "no constructive possession other than that involved in the rebilling at Kiowa as described." 34 Interst. Com. Com'n, 272. The Commission held that what the shipper desired and received was "through movement," and that the billing and rebilling was done "without taking or intending to take a real possession of the shipments" at Kiowa, and "were mere pro forma and paper transactions without substance, except as they might be the means of getting the through service to Woodward at less than the lawful rates." 34 Interst. Com. Com'n, 276.

In McFadden v. Alabama Gt. Southern Ry. Co., supra, cotton was shipped from Albertville, Ala., by the N., C. & St. L. Ry. to Attalla, Ala., thence by the Alabama Great Southern to Birmingham, Ala., on through bill of lading to that point. At Birmingham the cotton was compressed (the right to interrupt the journey for that purpose existing under the original shipment), the original bill of lading surrendered and the cotton rebilled to points without the state, not, however, from Birmingham, but back from Attalla, the rate from which point to the point outside the state (minus the local rate already paid from Attalla to Birmingham, for which the shipper got credit) plus the local

rate previously paid from Albertville to Attalla, was less than the full rate from Albertville to the point outside the state. In affirming judgment for the difference between this latter through rate and the sum of the rates paid, stress was laid upon the facts that the cotton remained at Birmingham "always in the possession and control of the carrier," that it was never delivered there to the shipper "as it might have been," and no control taken by him, except by rebilling from Attalla cotton then physically present at Birmingham. 241 Fed. 564, 566, 567, 154 C. C. A. 338.

We are not cited to, nor have we found, any cases more favorable to plaintiff's contention than those we have discussed. Neither of these cases is on all fours with the instant case. In the three water carriage cases the shipments could not move beyond the port in question except in interstate or foreign commerce. In none of the cases cited was an actual delivery to the consignee, previous to reshipment, made or attempted. In at least two of the cases a lack of such delivery is emphasized. None of them involved the feature of making payment of actual demurrage charges for delay before reshipping. In one of them, as we have seen, the absence of payment or tender of such charge was commented upon, and in another the fact of the actual allowance of additional free time because of the nature of the shipment. All of them seem to have turned, expressly or impliedly, upon the question of continuity of movement, actual or constructive.

Is the instant case distinguished from the cases cited? The petition contains, as we have seen, an express averment of defendants' order for the delivery of the cars to them at Oakley, an implied averment of such delivery there on the team tracks, express averments of demurrage charges for detention thereon, the receipt by defendants of the lumber at Oakley, and a subsequent reshipment to Madisonville—prima facie indicating a physical possession taken by defendants at Oakley; the mere fact that removal of the lumber from the cars at Oakley was not required does not impress us as enough to convert, as matter of law, an otherwise actual delivery into one merely constructive, colorable or evasive. Considering the petition as a whole, we think its natural construction is that while defendants intended ultimately to receive and use the lumber at Madisonville, and so to reship from Oakley, yet the latter point was regarded by both parties as the ultimate destination and place of delivery of the particular shipment itself, as distinguished from the ultimate destination of the lumber. There is no averment of a rebilling while the lumber was in transit, nor that any of the shipments were or could have been handled, after rebilling at Oakley, in the same train which brought them into Cincinnati, so making an actually continuous shipment, as in the Kanotex Case. Indeed, the petition, by necessary implication, negatives a continuous movement in fact. The fact that defendants obtained switching from Cincinnati to Oakley does not indicate that they were getting something for nothing. The switching was not "free"; the charge therefor was merely absorbed in the rates from the southern point to Cincinnati.

A new shipment by a consignee of an interstate shipment in the cars in which received to other points of destination does not necessarily

establish continuity of movement or prevent reshipment to a point within the same state from having an independent and intrastate character. Gulf, Colorado & S. F. Ry. Co. v. Texas, 204 U. S. 403; 27 Sup. Ct. 360, 51 L. Ed. 540—the Texarkana Case; C., M. & St. P. Ry. Co. v. Iowa, 233 U. S. 334, 343, 34 Sup. Ct. 592, 58 L. Ed. 988. In the former of these cases it was held that the interstate shipment (in that case carload lots) on reaching the point specified in the original contract of transportation ceased to be an interstate shipment, and that its further transportation to another point within the same state, on the order of the consignee, is controlled by the law of the state and not by the interstate commerce act. In the other case it was held that shipments of coal when reshipped after arrival from points without the state (and acceptance by the consignees) to points within the state on new and regular billing forms constituted intrastate shipments and were subject to the jurisdiction of the state railroad commission. We have not overlooked the fact that in the Texarkana Case the consignee did not have full title to and control of the shipment until its arrival at the point of reshipment; nor that in the Iowa case the point beyond which the coal was to be shipped was not determined until after its arrival at the point where the reshipment occurred. In the Ohio Railroad Commission Case, supra, the Texarkana Case was expressly distinguished upon the ground that "there a new and independent contract for intrastate shipment was made, the interstate transportation having been completely performed." It was similarly distinguished in the Sabine Tram Company Case, supra (227 U. S. 130, 33 Sup. Ct. 229, 57 L. Ed. 442)—citing the language just quoted—as well as in others of the cases we have discussed. But neither of these two cases has been overruled or criticized.

While the question is not free from difficulty, upon a careful consideration of the authorities we are disposed to think that the character of the shipment from Oakley to Madisonville is to be ultimately tested by the consideration whether or not there was an actual good-faith delivery of the shipments to the consignees at Oakley, and actually a new and independent shipment therefrom by defendants to Madisonville while the lumber was physically present and in their possession, and that the effect of such good-faith delivery, possession and independent reshipment is not, as a mere matter of law, converted into an interstate shipment by the existence of an original and continuing intention to so reship in intrastate commerce for the saving of expense.

May not a passenger by rail, desiring to travel from a point in one state to a point in another state, lawfully pay the local fare to the state line (or the interstate fare to a point beyond the state line) and then pay the local fare therefrom to a point within the state; or, again, may not one, in the course of shipping freight from one state to another, lawfully ship to the state line or just beyond it, at the local or interstate rate, as the case may be, and there receive actual delivery of the freight and thereupon reship locally? Neither of the suggested cases seems, in principle, opposed to the Interstate Commerce Act, for, in each case, the passenger or shipper, as the case may be, loses the benefit

of a through shipment. The passenger may have to leave the train to buy a new ticket, or may be required to pay his fare, perhaps at an inconvenient time, or to take the risk of inconvenience otherwise, as in respect to rechecking baggage. The shipper of freight must personally or by agent go to the trouble of accepting delivery and making reshipment, perhaps submitting to delays and (if in carload shipment) perhaps to unloading and reloading and possibly to paying demurrage. He also loses the benefit of the liability of the initial carrier. In each case some benefit incident to through transportation is given up. That such transaction is not necessarily a mere evasion of the act, and so unlawful, finds express support in Gulf, etc., Ry. Co. v. Texas, supra, 204 U. S. at page 413, 27 Sup. Ct. 360, 51 L. Ed. 540.

As the petition stood, the demurrer thereto should, in our opinion, have been sustained.

The judgment of the District Court is reversed, and the record remanded to that court, with directions to take further proceedings not inconsistent with this opinion.